### STATE

v.

Armando Juarez PEREZ.

No. 90–522–C.A.

Supreme Court of Rhode Island.

April 3, 1992.

James E. O'Neil, Atty. Gen., Aaron Weisman, Special Asst. Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for plaintiff.

Scott Lutes, Lidia M. Sanchez, Providence, for defendant.

### OPINION

FAY, Chief Justice.

The defendant, Armando Juarez Perez, appeals from a Superior Court conviction of first-degree murder whereby the defendant was sentenced to life imprisonment. The defendant avers that the trial justice erred (1) by denying the defendant's motion to

dismiss the indictment on grounds of double jeopardy and (2) by denying the defendant's motion to dismiss the indictment for lack of a speedy trial. For the reasons stated herein, the defendant's appeal is denied and dismissed, and the judgment of the Superior Court is affirmed.

On August 11, 1985, at approximately 9 a.m. the Narragansett police were summoned to a driveway located on Ocean Road. Upon arrival the police discovered a body wrapped in plastic and partially concealed in the brush. Also discovered at the scene were sheets of bloodstained cardboard, two jackets, a red visor cap, and numerous pieces of plastic. The body was later identified as Manuel Samayoa (Samayoa), who had apparently suffered two close-range .22–caliber gunshot wounds to the head.

Upon further investigation the police learned that Samayoa had resided at 55 Wilson Street in an apartment he had shared with Benjamin Giron. In addition the police learned that three individuals, Arcadio Vasquez (Vasquez), Vincente Rosales Gamez (Gamez), and Jose Valesquez (Valesquez), all shared the third-floor apartment at the same address, and Samayoa, Gamez, and Vasquez had all been employed at Carl–Gel Inc. (Carl–Gel), located in the city of Cranston. Furthermore the police observed two vehicles parked in the driveway at 55 Wilson Street. One was a Volkswagon belonging to Vasquez, and the other was an American Motors vehicle belonging to Gamez.

The police proceeded to Carl–Gel where they discovered lying about the parking lot various pieces of plastic material similar to those found at the scene where Samayoa's body had been discovered. In addition a subsequent search of the area revealed numerous large cardboard boxes and a .22–caliber shell casing. Blood samples were also taken from the flooring in an effort to determine whether they matched those taken from Samayoa's body.

Thereafter the police returned to 55 Wilson Street where they spoke with Vasquez, who was subsequently arrested on charges of being an illegal alien. Following his arrest Vasquez gave the police permission to search his apartment, where they discovered a .22–caliber rifle hidden in a wall compartment that was being used to house heating pipes. Thereafter the police issued a second warrant for Vasquez, charging him with the murder of Samayoa. Following the arrests the police impounded the American Motors vehicle belonging to Gamez. A search of the vehicle revealed samples of human blood in the trunk; however, they were unable to ascertain whether the blood was that of Samayoa.

In addition the police, apparently relying upon information received from Vasquez, issued a warrant for the arrest of defendant, also charging him with the murder of Samayoa. A search for defendant led the police to One Homestead Avenue in Smithfield, the home of Sharon Perez, defendant's wife. Unbeknownst to the police, defendant had fled the country a few days after Samayoa's murder. On August 14, 1985, defendant had apparently purchased a one-way ticket from Boston to Guatemala. The following day defendant had his live-in girlfriend, Rosario Celinas Perez Carbone (Carbone), drive him to the airport in Boston.

Following their search of the premises, the police discovered a paper bag containing twelve live .22–caliber bullets and one empty .22 caliber shell casing. In addition to gathering the foregoing information, the police conducted ballistics tests on the empty .22 caliber shell casings discovered at One Homestead Drive and at Carl–Gel. From their tests the police concluded that the casings had been fired from the rifle found in Vasquez's apartment at 55 Wilson Street.

An arraignment was held on November 13, 1985; however, because defendant had fled the country, he was not present. The defendant did not return to this country until July 17, 1986, at which time he was arrested and formally arraigned on July 18, 1986.

Because of numerous delays thereafter, defendant's trial was not reached until January 19, 1989. On five different occasions continuances were granted pursuant to the

state's request because, inter alia, key witnesses were unavailable or the state was otherwise unprepared. On two occasions new defense counsel had to be appointed following the filing of motions to withdraw. Furthermore, on August 24, 1988, defendant filed a motion for a speedy trial, which was granted on September 20, 1988. Lastly, because the case was not reached, the court twice postponed the trial on its own order. The trial finally commenced on January 19, 1989, but pursuant to defendant's insistence a mistrial was declared the following day.

The mistrial resulted from an unexpected disclosure by one of the state's witnesses, Carbone, who was to testify that on August 15, 1985, she had driven defendant to the airport in Boston and that defendant possessed an airline ticket to Guatemala. However, on the morning before Carbone's scheduled testimony, she informed the police of a conversation she had had with defendant the day before defendant's departure. Carbone indicated that defendant stated that he was fleeing the country because he had killed Samayoa and did not want to be caught. The defendant had killed Samayoa because he had caught Samayoa having sexual relations with his wife, Sharon Perez. The defendant told Carbone that Vasquez shot Samayoa once and that defendant shot Samayoa thereafter because he did not believe the first shot had killed Samayoa.

Upon learning of Carbone's revelation, the state requested an in-chambers conference to inform both the court and defense counsel of the nature of the unexpected testimony. A hearing was held in which Carbone related that her testimony with respect to defendant's statements had been given voluntarily and that her disclosure was delayed because she was concerned about retribution from defendant. The court concluded that Carbone's anticipated testimony was indeed relevant, but given its surprising nature, the court offered a five-day continuance to provide defendant with ample time to prepare adequately for cross-examination. Despite the court's offer of a continuance, defense counsel insisted that a mistrial be declared. Over the objection of the state the court acquiesced and granted defendant's motion for a mistrial.

A retrial was scheduled two weeks following the declaration of the mistrial. However, following continuances granted pursuant to the state's request and on the court's own order, the retrial was not reached until March 28, 1989. In addition, before the commencement of the retrial, defendant filed motions to dismiss the indictment on grounds of double jeopardy and also for lack of a speedy trial, both of which motions were denied.

Prior to defendant's initial trial Vasquez had turned state's witness and was allowed to plead guilty to the lesser charge of concealing a felony. During the retrial Vasquez provided the following testimony. He testified that he became familiar with both Samayoa and defendant while living in his native country of Guatemala. In addition to living in the apartment above Samayoa at 55 Wilson Street, Vasquez indicated that he and Samayoa worked the same shift at Carl–Gel. Vasquez also stated that on August 10, 1985, he gave Samayoa a ride to Carl–Gel, as he did every workday, and as was often the situation, Samayoa was intoxicated. When they arrived at Carl–Gel, Gamez was finishing his work shift. Vasquez asked Gamez to switch vehicles because Vasquez's Volkswagen was not operating properly. He indicated that he did not want to turn off the engine for fear that it would not restart. Vasquez therefore directed Gamez to drive the Volkswagen back to 55 Wilson Street, and following his own shift he would use Gamez's vehicle to return home.

Vasquez and Samayoa were the only employees working that evening. Because Samayoa was intoxicated, he stopped working and eventually fell asleep in a large cardboard box. Thereafter, defendant arrived at Carl–Gel with his wife, Sharon Perez. The defendant was carrying a .22–caliber rifle, and Sharon Perez was carrying a baseball bat. The defendant used threats of violence to get Vasquez to show him where Samayoa was located. Vasquez directed defendant to the box where Sa-

mayoa was sleeping, at which time defendant informed Vasquez that he was going to kill Samayoa. He instructed Vasquez to continue operating the machinery in order to muffle the sound of the gunshot.

Vasquez continued to operate the machinery and shortly thereafter heard a gunshot. The defendant called Vasquez to the location where Samayoa had been sleeping, at which time Vasquez observed Samayoa with blood flowing from the right side of his head. The defendant indicated to Vasquez that he shot Samayoa because it was the only way he could pay Samayoa back for "everything that he owed to him." Pursuant to defendant's threats Vasquez aided defendant in carrying Samayoa's body outside, where they placed it on the ground. Sharon Perez asked defendant if Samayoa was in fact dead, thereby prompting defendant to repeatedly kick Samayoa in the head and thereafter fire a second round into Samayoa's head.

The defendant then directed Vasquez to help him and Sharon Perez wrap the body and place it in the trunk of Gamez's vehicle. The trio used plastic, cardboard, and two jackets to conceal Samayoa's body. The defendant then fired a third shot into the dirt in order to clear the rifle.

Sharon Perez went back into Carl–Gel and attempted to clean the bloodstains from the cardboard and the floor. She testified that following her return outside, she observed defendant and Vasquez drinking beer together.

Vasquez indicated further that before leaving Carl–Gel, defendant placed the rifle and the bat in the trunk of defendant's vehicle. Thereafter, defendant ordered Vasquez to drive with him and Sharon Perez so that they could dispose of Samayoa's body. They drove for approximately forty-five minutes, stopping briefly to purchase cigarettes. They attempted to dispose of the body at a Narragansett beach, but the attempt was thwarted when defendant saw two people walking nearby. Thereafter they tried unsuccessfully to dispose of Samayoa's body at another beach location. At that point defendant, who had previously removed Samayoa's wallet, destroyed the contents therein so that no identification would be found on Samayoa's body.

The group ultimately arrived at the end of a driveway off Ocean Drive in Narragansett. There they disposed of Samayoa's body along with the plastic, cardboard, and jackets that had been used to conceal it. In addition defendant instructed Vasquez to leave the cap Vasquez had been wearing because defendant was afraid someone may have seen him wearing the cap as they were searching for a suitable location to dump the body. Thereafter the three returned to Carl–Gel. Prior to his departure therefrom, defendant made threats to Vasquez to keep him from telling anyone what they had done.

At approximately 9 a.m. the same day, defendant arrived at Vasquez's apartment and instructed him to hide the .22–caliber rifle that defendant had used to kill Samayoa. Although Vasquez was initially reluctant to hide the rifle in his apartment, he capitulated after defendant threatened to inform the police that Vasquez had killed Samayoa. The defendant also stated that if people started to talk about Samayoa's death, he and Vasquez might have to flee the country. As noted previously defendant did just that.

On the basis of the foregoing evidence elicited during defendant's retrial, defendant was convicted of murder and thereafter sentenced to life imprisonment. On April 24, 1989, defendant filed an appeal to this court.

## I

█ The defendant initially contends that the trial justice erred in denying his motion to dismiss based upon double jeopardy. The defendant claims that given the surprise nature of Carbone's testimony, he had no choice but to move for a mistrial. Indeed defendant argues that although the state's conduct may not have been intended to prod defendant into moving for a mistrial, the practical effect of such conduct was to vitiate his consent to the mistrial.

The Fifth Amendment to the United States Constitution, made applicable to the

states through the Fourteenth Amendment and article I, section 7, of the Rhode Island Constitution, protects a defendant from multiple prosecutions for the same offense. However, in ruling on a motion to dismiss based upon double jeopardy, the Supreme Court has recognized that a careful balance must be struck "between the right of a defendant to obtain a completion of his trial by the first tribunal assembled to pass in judgment upon him and the societal interest in apprehending and punishing those who are guilty of serious crimes." *State v. Diaz*, 521 A.2d 129, 133 (R.I.1987) (citing *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)).

In *Kennedy* the Supreme Court held "that '[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.'" *State v. Ferrara*, 571 A.2d 16, 22 (R.I. 1990); *State v. Gordon*, 508 A.2d 1339, 1345 (R.I.1986). "Such actions include bad-faith conduct designed to afford the prosecution a more favorable opportunity to convict the defendant." *State v. Gordon*, 508 A.2d at 1345 (citing *United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267, 276 (1976); *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100, 102–03 (1963)). "In such a case, the defendant's valued right to complete his trial before the first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the bar of double jeopardy in all circumstances." *Gordon*, 508 A.2d at 1345 (quoting *Kennedy*, 456 U.S. at 673, 102 S.Ct. at 2088, 72 L.Ed.2d at 423).

"Prosecutorial conduct not rising to the level of intentional bad-faith action designed to goad the defendant into seeking a mistrial is outside this narrow exception. Thus, mere prosecutorial error, although it may necessitate a mistrial, will not operate to preclude retrial." *Gordon*, 508 A.2d at 1345 (citing *Kennedy*, 456 U.S. at 675–76, 102 S.Ct. at 2089, 72 L.Ed.2d at 424–25; *United States v. Dinitz*, 424 U.S. at 607–09, 96 S.Ct. at 1079–80, 47 L.Ed.2d at 274; *United States v. Countryman*, 758 F.2d 574 (11th Cir.1985)). "The question of whether prosecutorial misconduct was intended to provoke a defendant into moving for a mistrial is a factual question to be decided by the trial court." *Ferrara*, 571 A.2d at 23 (citing *Diaz*, 521 A.2d at 133); *Gordon*, 508 A.2d at 1346 (citing *United States v. Posner*, 764 F.2d 1535, 1539 (11th Cir.1985)).

Although defendant concedes that Carbone's newly discovered testimony was as much a surprise to the state as it was to defendant and was not that which amounts to conduct on the part of the state intentionally to goad defendant into moving for a mistrial, defendant nonetheless contends that this court should adopt a more stringent rule than that adopted by the Court in *Kennedy*. It is conduct, however unintentional but nevertheless forcing a defendant to have no other choice but to move for a mistrial, that defendant seeks to add to the *Kennedy* exception.

This court was confronted with a similar argument in *Diaz* whereby a statement constituting evidence of premeditation was not disclosed to the defense during pretrial discovery but rather was raised for the first time at trial. Although this court held that the nondisclosure of the statement was indeed proper grounds to declare a mistrial, the absence of evidence of intentional misconduct by the prosecution designed to bring about a mistrial did not preclude the retrial of the defendant. *State v. Diaz*, 521 A.2d at 133.

Like defendant in the instant case, the defendant in *Diaz* sought a more stringent rule than that adopted in *Kennedy* with respect to the question of when a retrial is barred following a mistrial brought about at the request of the defendant. *Id.* In reaching our decision, this court stated that "the Fifth Amendment bar on retrials as interpreted by the United States Supreme Court constitutes a series of drastic remedies that may well allow a guilty defendant to go absolutely free because of a procedural miscalculation either by a trial judge or by the prosecution." *Id.* In addition this

court recognized the careful balancing the Court set forth in *Kennedy* that must be considered between the right of a defendant to obtain a completion of his trial by the first tribunal and the societal interest in apprehending and punishing those who are guilty of serious crimes. *Id.* In rejecting the defendant's assertion, we concluded that "the balance achieved by the Supreme Court of the United States is as favorable to the perceived rights of defendants as should rationally be applied in criminal cases." *Id.*

As it relates to the instant case, we believe the rationale set forth in *Diaz* remains sound. Hence we are not prepared to expand the rule in *Kennedy* to instances in which the state's conduct, although not intentionally designed to compel defendant into moving for a mistrial, is that which effectively requires a defendant to do so.

Furthermore we believe the trial justice acted properly in offering defendant a continuance following the state's revelation. Although defendant adamantly rejected the court's offer, insisting instead that a mistrial be declared, defendant fails to demonstrate how the declaration of a mistrial would have put defendant in a better position than he would have been in had he accepted the court offered continuance.

## II

More than forty-one months passed between October 18, 1985, the date the indictment was filed charging defendant with murder, and the commencement of the retrial on March 27, 1989. Prior to the start of defendant's retrial, the trial justice denied defendant's motion to dismiss for lack of a speedy trial. The defendant claims that such a denial was erroneous because the delay in bringing defendant to trial resulted in irreparable prejudice to his defense.

The right to a speedy trial is provided in the Sixth Amendment to the United States Constitution and article I, section 10, of the Rhode Island Constitution. This court has consistently recognized that a defendant's motion to dismiss for lack of a speedy trial is to be assessed according to the four-part test set forth by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *State v. Grundy*, 582 A.2d 1166 (R.I.1990); *State v. Simpson*, 573 A.2d 275 (R.I.1990); *State v. Wheaton*, 528 A.2d 1109 (R.I.1987). The elements of the four-part test include (1) length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant. *Grundy*, 582 A.2d at 1168. In examining the four factors, one must keep in mind that "[n]o singular factor is wholly dispositive of a speedy trial claim nor is the insufficiency of any one factor fatal to the claim." *Wheaton*, 528 A.2d at 1112–13 (citing *Barker v. Wingo*, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118–19). Accordingly we shall analyze defendant's claim in light of the four factors.

In examining the length of the delay, we note that this court has recognized that delays for periods much shorter than the forty-one months in the instant case were deemed presumptively prejudicial and thereby sufficient to trigger a speedy-trial analysis. *State v. Wheaton*, 528 A.2d 1109 (R.I.1987) (thirty-seven-month delay sufficient to trigger speedy-trial analysis); *State v. Macaskill*, 523 A.2d 883 (R.I.1987) (twenty-seven-month delay sufficient to trigger speedy-trial analysis); *State v. Adams*, 481 A.2d 718 (R.I.1984) (twenty-one-month delay sufficient to trigger speedy trial analysis). Accordingly the forty-one-month delay necessitates that we inquire further into the remaining three prongs of the balancing test and weigh each factor accordingly to determine whether defendant's constitutional right has been abridged.

"When weighing reasons for delay in a speedy-trial claim, the Supreme Court has held that 'different weights should be assigned to different reasons.'" *Macaskill*, 523 A.2d at 885 (quoting *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117). As the *Barker* Court stated:

"'A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as

negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.'" 523 A.2d at 885.

In the instant case the delay from the time the indictment was filed, October 18, 1985, to the time defendant was arraigned on July 18, 1986, can only be attributed to defendant's fleeing from the authorities. Although the delay suffered thereafter until the time of defendant's retrial was indeed sufficient in itself to trigger a speedy-trial analysis, the reasons for the delay derive from factors that include a succession of changes of defense counsel, a number of continuances granted to the state because of the unavailability of prosecution witnesses, and court congestion.

As noted, "[a]lthough court congestion is weighed against the state, it is not weighed so heavily as deliberate delay." *Macaskill,* 523 A.2d at 885 (citing *State v. Austin,* 462 A.2d 359, 362 (R.I.1983); *State v. Anthony,* 448 A.2d 744, 750 (R.I.1982)). In addition we have recognized that continuances granted as a result of missing witnesses are appropriate reasons for delay. *State v. Fortier,* 427 A.2d 1317, 1322 (R.I.1981) (citing *Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117). Furthermore, the record is without evidence that any of the state's continuances were motivated by bad faith or a deliberate intent to delay the proceedings. Last, given defendant's insistence that a mistrial be declared following the commencement of his initial trial, the delay resulting therefrom should not be weighed against the state.

The third factor to examine is defendant's assertion of his right to a speedy trial. On August 24, 1988, defendant filed a motion for speedy trial, approximately three years following the filing of the indictment. We have held that a defendant "figuratively banging on the courthouse doors asking that he be heard" sufficiently asserts the right to a speedy trial. *Macaskill,* 523 A.2d at 885 (quoting *Tate v. Howard,* 110 R.I. 641, 656, 296 A.2d 19, 27

(1972)). Although defendant admits, and we certainly agree, that he was not "knocking on the courthouse doors," the trial justice apparently concluded that fundamental fairness dictated that defendant's motion be granted. However, it appears that defendant's assertion of his right to a speedy trial was, at best, an afterthought.

The fourth and final factor to consider is prejudice to defendant. "The right to a speedy trial is intended to protect a defendant from '(i) * * * oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) limit the possibility that the defense will be impaired.'" *State v. Grundy,* 582 A.2d at 1169 (quoting *Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118). Although we have recognized that "delay that impairs the preparation of a defense causes the most serious form of prejudice," we have also recognized that "delay may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and * * * may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family, and his friends.'" *Wheaton,* 528 A.2d at 1112. However, we have "rejected the argument that the inherent prejudice a defendant endures while awaiting trial is sufficient [in itself] to satisfy the fourth factor." *Macaskill,* 523 A.2d at 886 (referring to *State v. Long,* 488 A.2d 427, 436 (R.I.1985)).

In the instant case defendant's claim of prejudice is premised on both grounds of impairment to his defense and to a lesser extent the anxiety and concern of being the accused. Thus by presenting evidence with respect to impairment of his defense, defendant has avoided the deficiency of relying solely upon the grounds of anxiety and concern.

With respect to defendant's claim of impairment to his defense, defendant asserts that the lengthy delay in bringing about a trial resulted in the unavailability of key witnesses. The witnesses Gamez, Valesquez, and Giron, according to defendant, would have testified that the state's witness, Vasquez, had a motive to kill Samay-

oa. As noted both Gamez and Valesquez shared an apartment with Vasquez, which apartment was located above Samayoa's at 55 Wilson Street. In addition Gamez was Vasquez's coworker at Carl–Gel. Giron shared an apartment with Samayoa.

The defendant argues that these three witnesses would have provided evidence to the effect that (1) Vasquez believed that Samayoa had burned Vasquez's automobile, (2) Vasquez informed Gamez the day following Samayoa's murder that there was blood inside Carl–Gel because a worker had had a nosebleed, and (3) Vasquez requested that Gamez change Samayoa's timesheet at Carl–Gel to indicate that he had not been at work the evening he was murdered. In addition defendant claims that these witnesses would have provided evidence that Vasquez had made prior inconsistent statements.

Unfortunately neither the record nor defendant provides any insight with respect to how such testimony would aid defendant's case. We are certainly not obligated to argue defendant's case. Furthermore the record does not reveal any evidence of an attempt on the part of defendant to contact any of the three named witnesses, nor does defendant's discovery list the three as potential witnesses. Although all three witnesses' statements were taken by the police, made part of the record, and made available to defendant, he never expressed any interest in interviewing any of them.

We determined that the defendant's motion for a speedy trial was at best an afterthought, and here too the defendant's argument that the lengthy delay resulted in the unavailability of key witnesses, thereby impairing his defense, appears to be much of the same. Hence we are of the opinion that the defendant suffered no real prejudice from the delay, and after examining all four factors, we are of the opinion that the trial justice did not err in denying the defendant's motion to dismiss for lack of a speedy trial.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of the Superior Court is affirmed, and the papers of this case are remanded to the Superior Court.