**STATE**

v.

**Calvin WALKER.**

**No. 92–248–C.A.**

Supreme Court of Rhode Island.

Dec. 12, 1995.

Jane McSoley, Asst. Atty. General, Aaron Weisman, Asst. Atty. General, for Plaintiff.

Michael St. Pierre, Warwick, for Defendant.

## OPINION

BOURCIER, Justice.

This is the defendant Calvin Walker's appeal from his May 27, 1987 convictions, after

jury trial, in the Newport County Superior Court.

### Facts and Case Travel

On November 14, 1986, Calvin Walker (Walker) was indicted by the Newport County grand jury on nine counts ranging from burglary to first-degree sexual assault. A jury, after trial, on May 20, 1987, returned guilty verdicts on all counts, except on the one count of burglary. On that count, Walker was found guilty of the lesser included offense of breaking and entering with intent to commit larceny.

The various charges all stemmed from Walker's nocturnal activities during the early morning hours of July 22, 1986. Dexter and Mary Coffin had come to Newport to enjoy their usual summer vacation in the friendly city by the sea. For that purpose they had rented a fashionable home on Bellevue Avenue and had as their houseguests, their two adult children, their granddaughter, two friends, and their maid. At about 2 a.m. on July 22, while the Coffins and their guests were asleep in their vacation home, quite appropriately named "Summer Wind," an ill wind blew in an unexpected intruder, the defendant Calvin Walker. We believe, as did the Newport jury, that Walker did not come to Summer Wind for social reasons. He had with him two realistic-looking plastic guns and a knife, which he promptly put to their intended use. He awakened the Coffins, threatened to kill them, bound their mouths with duct tape, robbed them and after binding their hands with telephone cord, proceeded to go from room to room, robbing and assaulting the remaining houseguests. One of those guests he forced into a bedroom and raped.

After completing his reign of terror through Summer Wind, which took place over a period of several hours, Walker then asked the Coffins and their guests, all of whom had been bound, taped, and ordered into one area, to tell him the location of the home wherein they were located. He was told that Summer Wind was between the Beechwood and Marble House mansions. Walker then telephoned for a taxicab to come to the Summer Wind residence and explained to the taxicab dispatcher where it was located. When the taxicab arrived, Walker, with his loot, consisting of a varied assortment of jewelry and money, left Summer Wind and told the unsuspecting taxicab driver to drive him to Providence. After Walker left, the Coffins were able to untie and free themselves, notify the Newport police of their nightmare, and describe the intruder.

Walker, in the meantime, after an uneventful taxicab ride into Providence, paid his fare and tipped the driver with some of the stolen money. He then promptly registered at the nearby Biltmore Hotel, once again using stolen money to pay for a room.

Shortly thereafter, while Walker was enjoying his stay in room 816 at the Biltmore Hotel, some unexpected guests dropped in to see him. Five Providence police detectives who had learned of his whereabouts came to visit. Walker was arrested and returned to Newport, charged, and held.

Having noted earlier that Walker was tried and later convicted on May 20, 1987, the circumstances regarding the approximately six-year time span from the time of filing his appeal to the certification of his trial record to this court mandate our inquiry.

### I

### The Appeal Delay

The defendant Walker, as noted earlier, was convicted after jury trial on May 20, 1987. On June 8, 1987, his motion for new trial was denied, and he was thereafter, on July 30, 1987, sentenced. Walker's counsel filed a timely notice of appeal and ordered the trial transcripts as required by Rule 10 of the Supreme Court Rules of Appellate Procedure. Shortly following the trial, Nancy Seal (Seal), the trial court stenographer, left Rhode Island without transcribing her trial notes. As a result Walker was not able to obtain the necessary trial transcripts, and the delay in perfecting his appeal commenced. After several months of unsuccessful attempts to locate Seal, the state enlisted the aid of the Rhode Island State Police to assist in locating her. The State Police ultimately found Seal in Florida and were able

to obtain the original trial and pretrial hearing stenographic notes.

Another court stenographer was assigned to transcribe Seal's stenographic notes and encountered difficulty in so doing. On December 2, 1988, the trial justice, after having been informed of the transcription difficulties, directed trial counsel to attempt to reconstruct certain unavailable portions of the record in accordance with Supreme Court Rule 10. Counsel collaborated with the court stenographer to reconstruct the record. All parties were able to come to agreement on the jury selection and jury trial records but were unable to agree upon and to reconstruct and transcribe the record of the pretrial motion and suppression hearings. Counsel for Walker and the state were able to stipulate concerning the jury selection and trial record, as transcribed by the court stenographer, and those agreed upon records were filed with the trial court.

The trial justice in November 1990, pursuant to Rule 10, ordered appellate and trial counsel once again to attempt reconstruction of the pretrial records so that he could certify a complete record for purposes of defendant Walker's appeal. Janet L. Novack (Novack), one of defendant's trial counsel, prepared a narrative of the pretrial hearings from her pretrial hearing notes. That narrative was given to the state's prosecutor, Michael Burns, who, after comparing Novack's notes to his own hearing notes, proposed certain changes and modifications. Appellate counsel for Walker reviewed the proposed changes and modifications submitted by the state prosecutor and agreed to all, with the exception of five proposed changes. Those five areas of disagreement were then submitted to the trial justice for his resolution. By letter of March 15, 1993, the trial justice scheduled a hearing for purposes of resolving the dispute. That hearing was held on April 30, 1993. The defendant Walker was present at that hearing and filed a pro se objection to the entire record reconstruction process. He alleged in his pro se motion that the pretrial and trial stenographer, Seal, did not take accurate notes and that as a result he would not be able to determine the accuracy and completeness of the reconstructed record. Walker himself argued his pro se objection to the record reconstruction process. Despite Walker's objections, appellate counsel for Walker and for the state both presented their respective positions to the trial justice and, to accommodate Walker, stipulated that his trial counsel's narrative to the trial justice would include Walker's recalled version of the pretrial hearing evidence. The trial justice, thereafter, on May 17, 1993, entered an Order in which he certified those portions of the record that had been transcribed from Seal's notes as the record of the jury selection and trial proceedings. He also certified the narrative of the pretrial hearings as prepared by Novack and the supplement thereto, consisting of defendant Walker's testimony, along with the modification to Novack's narrative agreed upon by counsel. The trial justice also overruled Walker's objection to the record reconstruction process. However, the trial justice treated one of Walker's blanket objection contentions, namely, that in view of the state of the record he should be granted a new trial, as a second motion for new trial, and denied it. On May 20, 1993, the trial justice by further Order, resolved the five unresolved factual pretrial hearing record disputes and certified what was the final portion of the appellate record. Five days later, on May 25, 1993, defendant Walker filed a pro se notice of appeal from the trial justice's denial of his motion for new trial, along with another pro se objection to the record certification process undertaken to perfect his appeal.

 Shortly thereafter, on July 7, 1993, Walker's appellate counsel from the Public Defender's office, filed their motion in this court seeking permission to withdraw as his counsel. In that motion appellate counsel stated:

"... appellate counsel, having actively engaged in that same reconstruction process, which admittedly took years to complete, and having stipulated to the completeness of the record as certified by the Superior Court, except for the few matters ultimately resolved by the trial judge, find themselves to be in absolute and irreconcilable conflict with Mr. Walker and, consequently

are unable to continue to represent him on appeal."

This court granted appellate counsel's motion to withdraw on June 16, 1993, and on October 14, 1993, appointed new counsel for Walker. That counsel, after various motions for continuances so as to permit review of the extensive record, was ordered finally to file Walker's appellate brief on or before April 9, 1995. That was done. Walker contends here on appeal that because of the six year period required to prepare and certify his pretrial and trial record, that he was denied his due process right to a speedy trial. He urges that we read into *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), an appellate delay extension, and that we should proceed to evaluate the appellate delay here in light of the four-part speedy trial test set out in *Barker*. That we decline to do. We have adopted the *Barker* four-part test with regard to a defendant's right to a speedy trial. *State v. Perez*, 605 A.2d 1305, 1310 (R.I.1992). We see no reason, on the facts in this case, to expand our holding in *Perez*.

We find no prejudice resulting to defendant in the delay caused by the reconstruction and certification process of his Superior Court pretrial and trial record. He makes no claim that there is any appellate prejudice resulting from the delay. With regard to any personal prejudice in being held without bail pending his appeal, such prejudice, if any, is illusory. Shortly after his convictions here in Newport, he was transferred to the State of New York to stand trial there on two separate sexual assault charges, and after trials he was sentenced on September 6 and November 30, 1988, to serve consecutive prison terms of twelve and one-half to twenty-five years. The delay here, accordingly, although unusual, has not prejudiced Walker's right to meaningful appellate review.

We are satisfied here that the trial justice acted in compliance with Supreme Court Rule 10(c), which provides for completion of the required appellate record in circumstances such as are present in this case. We find no error in the proceedings as undertaken by the trial justice to complete and certify the trial court record. In fact, we note that his proceedings were not only in accord with Rule 10(c) but also in substantial accord with precedential decisions of this court that pre-date adoption of our Rule. *Baffoni v. Baffoni*, 76 R.I. 291, 69 A.2d 503 (1949); *McSherry v. Peckham*, 50 R.I. 473, 149 A. 380 (1930).

The United States Supreme Court in *Draper v. Washington*, 372 U.S. 487, 499, 83 S.Ct. 774, 780–781, 9 L.Ed.2d 899, 908 (1963), has held that a defendant in a criminal case on appeal must be furnished with a record of sufficient completeness to permit full and fair appellate review of his or her appellate claims. *See also United States v. Kenney*, 911 F.2d 315, 318 (9th Cir.1990); *People v. Chessman*, 35 Cal.2d 455, 460, 218 P.2d 769, 773 (1950); *State v. Vitale*, 190 Conn. 219, 223, 460 A.2d 961, 965 (1983); *Commonwealth v. Harris*, 376 Mass. 74, 77, 379 N.E.2d 1073, 1075 (1978). We are satisfied in this case that Walker was provided with a sufficiently complete and accurate pretrial and trial hearing record that permits meaningful appellate review of his claims of error in the proceedings against him in the Superior Court. We next address those claims.

## II

### The Warrantless Search

Walker alleges that the warrantless search of his hotel room by the Providence police on July 22, 1986, violated his Fourth Amendment right to be free from unreasonable search and seizure. The trial justice in the Superior Court denied his pretrial motion to suppress the fruits of that search, which consisted of the money and jewelry taken from the occupants of Summer Wind in Newport. Walker claims that the trial justice erred in rejecting his motion to suppress. We note that in reviewing Walker's alleged claim of error, we must view the trial justice's decision regarding the search in a light most favorable to the state and to apply thereto the "clearly erroneous" standard rule. *State v. Beaumier*, 480 A.2d 1367, 1375 (R.I.1984). We acknowledge also that a warrantless search is per se unreasonable unless the circumstances surrounding that search fall within one of the few, but well established exceptions to the warrant require-

ment. *State v. Jennings,* 461 A.2d 361, 365 (R.I.1983) (citing *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290, 298–99 (1978)).

On the basis of the facts and evidence before the trial justice in this case, we find no error in his ruling. The trial justice found that there was probable cause existing to warrant Walker's arrest. In the course of that arrest process, Walker had not only consented to the search of his hotel room, but, in addition, there were exigent circumstances present that justified the search and seizure of the stolen money and jewelry that were in plain view of the arresting officer.

The record shows that at about 8 a.m. on July 22, 1987, about three hours after the robberies at Summer Wind had been reported to the Newport police, that police department received information that the robber had been driven by taxicab into Providence and had been let out near the then located bus terminal. The Providence police were alerted to look for the robber and given a description of him. Shortly after 8 a.m., Providence Detective Chester White learned that a black male, fitting the description of the robber, had registered at the Biltmore Hotel and was lodged in room 816. Detective White and his partner, Detective John Corley, after calling for police backup assistance, went to room 816. At that time three other Providence detectives responded. Because of the fact that the robber was said to have been armed and dangerous, the detectives positioned themselves out of harm's way in the hotel corridor next to room 816. Detective White then proceeded to knock on the hotel room door. The door was opened from the inside by Walker but only as far as the door security chain would permit. Detective White announced himself as "the police" and told Walker that he wanted to talk to him. Walker responded and said, "Wait a minute, I have to put clothes on," and Walker then closed the door. A minute or so later, Walker opened the door, detached the security chain, and immediately said to Detective White, "You got me. How did you find me." Walker motioned for Detective White to enter, and White did so, along with the other detectives. Detective Lopardo immediately

began to advise Walker of his *Miranda* rights (*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) along with another detective, Stephen Springer, who was reading from a printed rights waiver form. While they were doing so, Walker kept repeating, "How did you find me, I seem to be very popular, and I should have hot footed out of here." Walker then told Detective Corley, "There it is," and he pointed to a nearby coffee table covered with jewelry and a "stack of currency," the top bill being a $100 bill. After Detectives Lopardo and Springer completed advising Walker of his *Miranda* rights, Walker shortly thereafter told the Providence detectives that he would not answer any of their questions but that he would give a statement to the Newport police.

On the facts present in the record before us, we will not disturb the trial justice's finding that Walker had freely and voluntarily consented to the entry into his hotel room by the Providence police and that he then pointed out to them the robbery loot that was in plain view on top of the coffee table a short distance from the doorway leading into the room. Having so consented, Walker's warrantless entry and search claim is without merit.

### III

#### The Motions to Suppress

Walker claims that the trial justice erred in denying his pretrial motion to suppress certain incriminating statements made by him to the Providence and Newport police at the time of and following his arrest and detention. That claim requires us to examine the totality of the circumstances, then existent, when Walker made his incriminating statements to the police. *Haynes v. Washington,* 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 521 (1963). From our examination of the record, we must determine whether the evidence before the trial justice was sufficiently clear and convincing to permit the finding made, namely, that Walker had voluntarily waived his right to remain silent and have the assistance of counsel. *State v. Ferola,* 518 A.2d 1339, 1345

(R.I.1986); *State v. Verlaque,* 465 A.2d 207, 209–10 (R.I.1983).

With regard to Walker's statements made while in the hotel room, we conclude from the record that his claim of error must be examined in three parts. First, we examine the statements that he made to the police officers when they first entered the hotel room with his consent and while *in the process* of being advised of his *Miranda* rights. At that time, Walker volunteered to the officers, "Okay, you got me," "How did you find me," and "I did it." Second, we must view the statements made by Walker *after* he had been fully advised of his *Miranda* rights while still in the hotel room. Those statements were "I did it" and "I should have hot footed it." In addition, Walker, while pointing in the direction of a coffee table in the room said, "There it is." The coffee table was covered with jewelry and a stack of currency. Finally, we must examine Walker's statements made at the Providence police station, and later while in the custody of the Newport police. Walker, while in the Providence police station, was again given his *Miranda* warnings and advised of his right to counsel. He waived those rights and was thereafter questioned by the Providence police. At one point during that interrogation, he admitted that an expensive wristwatch that he was wearing had been taken by him from one of the Summer Wind guests. Later that day, while in police custody in Newport, Walker was again given his *Miranda* warnings and again advised of his right to have counsel present, which offer he again declined. He was then questioned by the Newport police. At that time he admitted his part in the robberies but denied that he had raped one of the houseguests. Walker told the Newport police that although he did have sexual intercourse with one of the houseguests, that intercourse was not "forced" but instead was "willing" and consensual. He said that the houseguest, after being pushed into the bedroom by him, was a "willing" partner and "appeared to enjoy it."

■ With regard to the statements first made by Walker when the Providence police initially, with his consent, entered his hotel room, the trial justice found those statements to have been spontaneous and volunteered statements, freely made by Walker. The record supports that finding. He has no *Miranda* protection in them. The *Miranda* doctrine is not applicable to spontaneous statements but is triggered only by the dual presence of custody and interrogation.

With regard to the later incriminating statements made by Walker while at the Providence police station and to the Newport police while en route to Newport and again while at the Newport police station, the trial justice found that Walker, prior to making those statements, had been given his *Miranda* warnings and had consistently declined the assistance of counsel. The trial justice found that Walker had signed a *Miranda* rights waiver form and that he understood those *Miranda* rights and had freely and intelligently waived them. The trial justice also found that Walker was not at any time acting under any compulsion or threat. Those findings are persuasive. *State v. Leuthavone,* 640 A.2d 515, 519 (R.I.1994).

We have long adhered to the view that findings made by a trial justice relating to the giving of *Miranda* admonitions and their sufficiency will not be set aside or disturbed on review unless clearly erroneous. *State v. Houde,* 596 A.2d 330, 335–36 (R.I.1991). The suppression hearing record in this case reveals no error on the part of the trial justice or in his findings. We affirm those findings.

## IV

### Pretrial Identification

■ Walker claims error in the manner in which the Newport police conducted a pretrial lineup from which several of the Summer Wind victims were able to identify him as the intruder. He asserts that shortly after the incident the victims had described the intruder as wearing white pants. In the lineup he was the only person wearing white pants. Accordingly, he contends, that fact made the lineup impermissibly suggestive and conducive to irreparable mistaken identification and the evidence of those pretrial identifications should not have been permitted at his trial. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19

L.Ed.2d 1247, 1253 (1968); *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967); *State v. Porraro,* 121 R.I. 882, 885–86, 404 A.2d 465, 467–68 (1979).

■ In determining whether the lineup identification procedure used in this case violated Walker's due process rights, we employ a two-part test. First, we consider whether the makeup of the lineup and the procedures utilized in the subsequent identification process were unnecessarily or impermissibly suggestive. Second, if we find in the lineup and identification process used any unnecessary or improper suggestiveness, we must then undertake to determine if any identification made has independent reliability, despite the suggestive nature of the lineup procedure. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *see also State v. Gomes,* 604 A.2d 1249, 1253 (R.I. 1992).

In reviewing the record and the trial justice's findings in light of our two-part test rule, we find no error in the findings made by the trial justice. He found that the fact that Walker was the only person in the lineup wearing white pants was not per se suggestive, but only a factor to be considered with all the other circumstances leading to any identification. He found that certain of the victims from Summer Wind had totally independent identification bases for making their identifications, other than from the lineup showing. For example, Merilee O'Neil, one of the unfortunate Summer Wind guests, testified that she saw Walker's face at least six times during the home invasion when his face mask slipped down on his face. The trial justice noted that not all of the Summer Wind victims were able to identify Walker from the lineup, despite their observing Walker in his white pants. He found that those who did make identifications at the lineup did not do so on the basis of the white pants but instead on the basis of having previously seen Walker inside Summer Wind during his almost three hour stay there. Additionally, Albert Hall, the taxicab driver who transported Walker from Newport to Providence, identified Walker relying upon his observation of Walker during the ride to Providence.

We are satisfied from the record that the trial justice properly determined the identifications to have been independently reliable, based upon the opportunity of each witness to have observed Walker. He considered their degree of attention to Walker, the accuracy of their prior descriptions of Walker, and the levels of certainty demonstrated by them at the lineup, including the fact that the lineup was conducted shortly after the Summer Wind robberies and rape. We have previously approved of those principles. *Gomes,* 604 A.2d at 1253; *State v. Hadrick,* 523 A.2d 441, 442–43 (R.I.1987).

We note in denying Walker's claim of error in the Newport lineup procedures that his challenge appears to suggest that he was mistakenly identified as the intruder. That contention is interesting in view of the fact that on the morning of his arrest, he had steadfastly asserted that he had not raped his unfortunate Summer Wind victim but instead that the sexual intercourse had been consented to by the victim. He also stated that she did so "willingly" and "appeared to enjoy it." It would not be unreasonable for us to take judicial notice of the fact that in order for Walker to have sexually penetrated his victim, willing or otherwise, he would have had to have been physically present in Summer Wind during the early morning hours of July 22, 1987.

■ Walker's final claim of error by the trial court is that the trial justice erred in submitting to the jury the lesser included offense of entering a dwelling house with the intent to commit larceny, after granting his motion for judgment of acquittal on the burglary count. He contends that in doing so, the trial justice had, in effect, amended the grand jury indictment without his consent. Walker overlooks G.L.1956 (1994 Reenactment) § 12–17–14 as well as this court's holding in *State v. Walsh,* 113 R.I. 118, 122, 318 A.2d 463, 466 (1974). An accusation of the greater crime carries with it the charge that he has committed all necessarily included lesser offenses. *Walsh* adequately disposes of Walker's claim of procedural and constitutional deprivation.

For all the above reasons the defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the papers of the case are remanded to the Newport County Superior Court.